Randy Hooks sued his employer, Jackson Landscaping, Inc., on November 13, 2000, seeking to recover workers' compensation benefits for injuries he allegedly sustained to his lower back and his left ankle and foot during the course of his employment with Jackson Landscaping. Following an ore tenus proceeding, the trial court, on February 4, 2002, entered an order finding that Hooks's alleged back injury arose out of and in the course of his employment with Jackson Landscaping and that Jackson Landscaping was liable for the medical treatment necessarily related to the injury.[1] Jackson Landscaping appeals.
This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262,268 (Ala. 1996), quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012,1014 (Ala.Civ.App. 1995).
The sole issue on appeal is whether Hooks's back injury is causally related to his work-related accident. For an injury to be compensable, it must be "caused by an accident arising out of and in the course of" the employee's employment. § 25-5-51, Ala. Code 1975. The phrase "arising out of" an employee's employment requires a causal connection between the injury and the employment. Dunlop Tire Rubber Co. v. Pettus,623 So.2d 313, 314 (Ala.Civ.App. 1993). The phrase "in the course of" the employee's employment refers to the time, place, and circumstances under which the accident occurred. Id. In accident cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial *Page 1269 
evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused, or was a contributing cause of, the injury. Ex parte Trinity Indus., Inc., 680 So.2d at 266 n. 3. The trial court may find medical causation without testimony from medical doctors. Ex parte Price, 555 So.2d 1060 (Ala. 1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, ADivision of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App. 1993).
Hooks was employed by Jackson Landscaping as a laborer. On June 3, 1999, Hooks, while a passenger in an automobile driven by a coworker, was injured in a single-vehicle accident. It is undisputed that the automobile accident occurred within the line and scope of Hooks's employment with Jackson Landscaping and that Hooks injured his left ankle and foot during the automobile accident. Hooks also claims that he ruptured a disc in his lower back as a result of the accident. Jackson Landscaping contends that Hooks's back injury did not arise out of and in the course of his employment.
Hooks was transferred to the emergency room at Jackson Hospital after the automobile accident. He testified that when he arrived at the emergency room both his foot and lower back were in pain, but that the pain in his foot was the most severe. He stated that he reported his lower back pain to the emergency room physician and that he received an injection in his back for the pain. He further testified that he was bleeding from his lower back and that he received sutures in his lower back.
The records from the emergency room at Jackson Hospital indicate that after the automobile accident, Hooks complained of neck pain and left ankle pain. Contrary to Hooks's testimony, the emergency room records indicate that he did not complain of lower back pain. The records do indicate that Hooks was treated for a three-centimeter superficial laceration to his left buttock, and that, rather than being given an injection in the back for the purported back pain as Hooks claims, he was injected with lidocaine, a local anesthesia, and given sutures in the left buttock to repair the laceration. Hooks was released from the emergency room with a diagnosis of "sprained left foot ankle; cervical strain; sutures."
Hooks was positive at trial that he had informed the emergency room physician that he was suffering lower back pain and that the only laceration he had was to his lower back. When confronted with the fact that the emergency room records do not indicate that he complained of lower back pain and that the sutures he received were to repair a laceration to his buttocks and not his lower back, Hooks explained that the records contained a "misprint." We note that the emergency room records refer to a laceration to the buttocks no less than six times and contain three diagrams depicting a laceration to the buttocks, rather than to the lower back.
Hooks was referred to Dr. Charles W. Hartzog, Jr., an orthopedic surgeon, for treatment of his ankle and foot injury. Hook was first seen by Dr. Hartzog on June 8, 1999, complaining of left foot pain. Dr. Hartzog noted that Hooks had a significant bruise to the calcaneal nerve in the foot with a hematoma or superficial blood-clot formation. Dr. Hartzog diagnosed Hooks with a contusion to the foot with a medial ankle sprain. He took Hooks off of work.
Hooks continued to be treated by Dr. Hartzog on numerous occasions between June 8, 1999, and February 11, 2000. On July 26, 1999, Hooks was seen by Dr. *Page 1270 
Hartzog for his ankle and foot injury. At that time, Hooks described some shooting pains down his left leg. Dr. Hartzog noted that the foot injury was improving. Hooks returned to Dr. Hartzog on August 10, 1999, complaining of "pins-and-needles" type pain, which Dr. Hartzog related to "peripheral nerve return." Dr. Hartzog noted that the ankle and foot injury continued to improve. He determined that Hooks had reached maximum medical improvement on August 31, 1999, with no permanent impairment and he returned Hooks to work at full duty on that date. Hooks returned to Dr. Hartzog on December 30, 1999, and February 11, 2000, complaining of pain and swelling in his left foot; however, Dr. Hartzog continued Hooks on his normal work duties.
Dr. Hartzog's records do not indicate that Hooks ever complained of any lower back pain during the time that he treated him from June 8, 1999, to February 11, 2000. Hooks testified as follows:
"Q. Did you ever tell Dr. Hartzog you hurt your back?
". . . .
"A. I didn't specifically go to the back.
 "Q. Did you in any way talk about the back, specifically or not specifically?
"A. No, I didn't. I didn't know it was the back.
"Q. You didn't know it was the back?
"A. No."
This testimony contradicts earlier testimony in which Hooks stated that he had told the emergency room physician that he was having pain in his lower back. Hooks did inform Dr. Hartzog, however, that he had pain radiating up and down his left leg. Hooks stated that he was on crutches after the accident, but that as he began to bear weight on his left leg he began experiencing pain radiating up into his back.
Hooks testified that he returned to work at his normal duties, but that he walked with a limp and was not as productive as he had been before the accident. He ultimately quit his employment with Jackson Landscaping on February 18, 2000. He testified at trial that he quit because of pain and a lack of transportation to and from work. However, he testified under oath at an unemployment compensation benefits hearing that he quit solely because of a lack of transportation to and from work and he did not mention a back injury at the hearing.
Dr. Hartzog referred Hooks to Dr. D.D. Thornbury, an orthopedic surgeon, for evaluation of Hooks's continued complaints with his ankle and foot. Dr. Thornbury first saw Hooks on February 23, 2000, and diagnosed him with chronic foot pain at that time. Hooks returned to Dr. Thornbury on October 19, 2000, with continued complaints regarding his ankle and foot. Additionally, Hooks complained of lower back pain with pain radiating down his left leg. A physical exam revealed some limited forward flexion and some minor muscle spasm. This is the first documented complaint of lower back pain by Hooks in the 16 months following the automobile accident. Hooks testified as follows:
 "Q. Dr. Thornbury treated you for your back; is that right?
"A. He did a preliminary examination on my back.
 "Q. Isn't that true that's the first time you told a doctor that your back hurt?
 "A. Yes, that's the first time that my back actually started hurting."
This testimony by Hooks again contradicts his earlier testimony in which he stated that he told the emergency room physician that he was experiencing lower back pain after the automobile accident.
X-rays taken by Dr. Thornbury revealed a narrowing of the L5-S1 disc space. Dr. Thornbury diagnosed Hooks with degenerative disc disease and probable L5-S1 radiculopathy. Dr. Thornbury stated the following in a letter to Jackson Landscaping's workers' compensation administrator: *Page 1271 
 "At that time [October 19, 2000] he said he was beginning to have some low back pain that radiated all the way down his leg to his foot. His x-rays demonstrated L5-S1 disc space narrowing, suggestive of degenerative disc disease.
 "The patient, at that time, tried to relate this to his injury but I have looked through his entire chart and this was the first mention of any low back pain and radicular pain this patient has had.
 "So, my professional opinion, while he may very well have some legitimate lower back problems and radicular type pain, I cannot relate it to his injury to his foot from June of 1999. . . .
 "I have referred him to Dr. Holt for his back problems as I think they probably are legitimate but not related to his ankle injury."
Dr. Thornbury referred Hooks to Dr. Timothy A. Holt, an orthopedic surgeon, for evaluation of his lower back complaints. Hooks was first seen by Dr. Holt on November 3, 2000, complaining of lower back pain that radiated down the left leg. An MRI revealed a large extruding disc fragment at the L5-S1 disc level with narrowing of the spinal canal at the L4-L5 level. Dr. Holt recommended that Hooks have surgery to repair the disc. Dr. Holt testified as follows regarding the causal connection between the back injury he diagnosed in November 2000, to the June 1999 automobile accident that Hooks was involved:
 "Q. Is it possible that he didn't experience his back pain that was due to the injury or the car wreck until later?
"A. That would be highly unusual.
 "Q. I noticed in your notes that you had stated that he had been on crutches for a foot injury in the wreck.
"A. Correct.
 "Q. And I'm referring to the 11/10 notes . . . where you said that he had been keeping the weight off that side and this was probably — this could have been the reason why he didn't experience the pain sooner?
"A. Could have been.
 "Q. I know from personal experience that it was about six months after a car wreck that I started feeling pain in my back. Is that possible?
 "A. It is possible. It's just unlikely. . . . Especially in the situation he's in, being on crutches.
"Q. What do you mean by that?
 "A. Well, he wasn't weight-bearing on the left leg. Then, when he started weight-bearing on the left leg, he began having the radicular pain.
 "Q. So could you state with a reasonable degree of medical certainty that this injury was caused by the wreck?
 "A. I can say there's a probability it could have been, yes."
Jack Jackson, the owner of Jackson Landscaping, testified that at no time did Hooks ever inform him that he was experiencing back pain and that the first time he learned that Hooks was alleging a back injury was when the complaint was filed in this case. Jackson further testified that when Hooks returned to work he did not observe any problems with his work performance. The first report of injury indicates that Hooks stated that he hurt his ankle and suffered a laceration to his buttocks. Jackson testified that he completed the first report of injury and that Hooks did not report that he had injured his back. Additionally, two of Hooks's coemployees testified that he never mentioned any back pain or back injury to them after the automobile accident.
After carefully reviewing the record, we conclude that Hooks failed to prove that his back injury was causally related to the automobile accident and that the trial court's finding on that issue is not supported by substantial evidence. Hooks's testimony that he received sutures in his lower back and that he informed the emergency room physician that he was experiencing lower back pain after the *Page 1272 
accident is completely contradicted by the emergency room records regarding Hooks's complaints and the treatment he received. Hooks explains the discrepancy as a "misprint," even though a laceration to the buttocks area is referred to on six occasions and depicted in a diagram on three occasions.
Hooks did not complain of lower back pain until approximately 16 months after the automobile accident. He stated that he did not tell Dr. Hartzog of the back pain because he "didn't know it was the back." This contradicts earlier testimony in which he stated that he informed the emergency room physician that he was experiencing back pain. Hooks testified that he did not complain of back pain to Dr. Thornbury until October 2000, because, he says, that was the first time "that [his] back actually started hurting." Again, this contradicts earlier testimony. Dr. Thornbury specifically testified that the back injury was not related to the June 3, 1999, automobile accident. Dr. Holt testified that Hooks's back complaints, coming approximately 16 months after the accident, were "highly unusual." When asked if the back injury and the automobile accident were causally related he could only say that there was a "probability [that] it could have been."
Additionally, we note the following exchange between the trial court and counsel for Jackson Landscaping:
 "[The Court]: Okay. Let me tell y'all, I am obviously going to have to go read the doctors' depositions because I haven't read them. But I will just tell y'all my feelings about from just sitting here. First of all, I don't think Mr. Hooks is making one thing up. I mean, I think this is a classic case of, yeah, his ankle was hurt and his back was hurt. And, you know, I know how men are. And you ask them what — I mean, I ask my husband how do you feel. Oh, I feel fine. Then five days later, you know, he has got this horrible flu. And I am like why didn't you say anything? Well, it wasn't that bad or whatever. It doesn't mean much to me about what the guy was saying or not saying. He is saying my leg is hurting. He obviously had trauma to his back. That's evident from the medical report with the cut on the back. The doctors referring him. Obviously there is a problem with his back.
". . . .
 "[Counsel for Jackson Landscaping]: We don't dispute that Mr. Hooks has a back problem. I think that's clear from Dr. Holt's opinions.
 "[The Court]: I don't dispute that the back problem started from the accident. I mean, that trauma, that getting those stitches and it's developed. I mean, it might not have hurt right then. I think the man legitimately tried to go back to work and worked his hardest. And guys don't sit and complain to each other I am hurt. That's just not guys. They don't say anything. Some do. But then if you do, you're a whiney. You just don't say anything. I mean, I think he did legitimately go back and do the best he could do, which obviously was pretty good. Everyone said it was. But I think, as he has gone on, his back has gotten worse and worse because that's what happens when you get one of those injuries.
 "[Counsel for Jackson Landscaping]: I think what our position is with regard to the initial injury though is that there was no back injury. If the medical records from the emergency room don't touch on the back —
 "[The Court]: Well, it says cervical from Jackson. It says that he has a cervical sprain.
 "[Counsel for Jackson Landscaping]: That's in the neck. That's up here. And he has no complaints about his back. *Page 1273 
 "[The Court]: He has got those stitches in his back. We can all agree on that.
 "[Counsel for Jackson Landscaping]: No, Judge, he has got stitches in his butt.
 "[The Court]: Well, the back area right back — when I say butt or back, it's basically the same thing, that whole area down there where your spine — your spine goes all the way into your buttocks area. I mean, I am not going to sit and be — I am not going to be picky about how far down into your buttocks area. I mean, that's your back."
We conclude that the trial court misinterpreted the evidence; therefore, the judgment is not supported by substantial evidence. Accordingly, the judgment of the court is reversed and the case is remanded for the trial court to enter an order consistent with this opinion.
REVERSED AND REMANDED.
Thompson and Pittman, JJ., concur.
[1] The compensability of the ankle injury was not disputed, and it is not an issue on appeal.