THOMPSON, Presiding Judge.
Maxim Healthcare Services, Inc. (“Maxim”), appeals from the judgment of the Jefferson Circuit Court in favor of Debra Taylor Freeman in her action against Maxim under the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”). For the reasons set forth herein, we affirm.
In 2004, Freeman, a licensed practical nurse, began working for Maxim, a nursing-referral agency. As part of her employment with Maxim, she was referred to various job sites and facilities to work. On December 24, 2008, Freeman was working at a rehabilitation facility in Tuscaloosa to which Maxim had referred her. While she was lifting a patient from a toilet to place her in a wheelchair, the wheelchair moved, causing Freeman to overextend herself while she was attempting to place the patient into the wheelchair. As she did so, Freeman felt a burning sensation in her lower back that extended into her hips. A few minutes later, the pain in her back and hips became excruciating and radiated into her legs, making it difficult for her to walk. After completing her shift, she went to the emergency room where she complained of back pain and hip pain. At the emergency room, she received multiple injections of pain relievers and steroids and was given pain medication to take orally. The doctor at the emergency room told her to follow up with an orthopedic doctor.
On April 17, 2009, Freeman filed an action against Maxim seeking benefits and compensation pursuant to the Act. On July 11, 2011, the trial court held a bench trial in the action. At the beginning of the trial, the parties stipulated, among other things, that Freeman received an injury to her left hip and left leg arising out of and *976 in the course of her employment with Maxim and that Freeman gave proper notice of her injury. The parties indicated that there was a dispute as to whether Freeman’s back problems were related to the accident.
The medical records submitted into evidence at the trial revealed the following pertinent information. Freeman was treated by Dr. William Lupinacci on January 15, 2009. At that appointment, Freeman indicated that her symptoms were improving. He diagnosed her with a back strain and told her to return for evaluation.
A treatment note from Dr. Lupinacci from January 22, 2009, indicated that Freeman was continuing to experience back pain and that she was having to take time off work due to the pain. He prescribed her 2 weeks of physical therapy and limited her to lifting no more than 20 pounds.
A note from Dr. Lupinacci from February 2, 2009, indicated that Freeman’s pain had not improved and that she was experiencing radicular pain into her left leg. He diagnosed her with a lumbar strain and lumbar radiculopathy and continued her work restriction regarding lifting.
Dr. Andrew Cordover began treating Freeman in February 2009. A medical note from an appointment Freeman had with Dr. Cordover on February 18, 2009, indicated that Freeman’s chief complaints were back pain, left-hip pain, and left-leg pain. He ordered an MRI of her lower back and left hip, and he limited her to light work with no repetitive bending or twisting at her waist and no squatting or kneeling. The MRI of Freeman’s left hip indicated a possible labral tear*. The MRI of Freeman’s lower back revealed mild degenerative disk bulges at multiple levels without spinal stenosis or neural compression.
In a work-status form prepared by Dr. Cordover and dated March 25, 2009, Dr. Cordover continued the same work restrictions he had previously assigned to Freeman, and he indicated that he had referred her to Dr. Jeffrey Cusmariu, another physician in the same practice as Dr. Cord-over.
A medical note from Dr. Cusmariu dated April 10, 2009, indicated that Dr. Cusmariu kept Freeman’s prior work restrictions in place and added that she should be sitting about 50% of her shift with no climbing stairs or ladders. He ordered a second MRI of her left hip, the results of which again indicated a labral tear.
A medical note from Dr. Cusmariu dated April 21, 2009, indicated that Freeman was continuing to complain of pain in her lower back and hip that radiated into her left leg. After reviewing the MRI of her left hip and performing a physical examination, Dr. Cusmariu diagnosed Freeman with left-hip pain, left-hip greater trochanteric bursitis with left sacroiliac joint dysfunction, mild lumbar degenerative disk disease, and a possible left-hip labral tear. Dr. Cusmariu indicated that he did not believe that a labral tear was the cause of Freeman’s pain. He ordered more physical therapy for Freeman and indicated that, if that did not resolve her pain, he would refer her back to Dr. Cordover for further management of her back pain. He kept the same work restrictions in place.
A medical note from Dr. Cusmariu dated June 16, 2009, indicated that Freeman had obtained significant relief from her pain symptoms following an injection into her sacroiliac joint. He reduced her work restrictions to no sustained squatting and no repetitive bending at the waist. However, in a medical note dated July 14, 2009, Dr. Cusmariu indicated that Freeman’s pain had increased since he had last seen her. *977 He indicated that her job had required her to drive long distances and that that, along with her having to help a hospice patient, had exacerbated her pain. He indicated that the pain she was experiencing did not originate with her left hip. He again restricted her to light-duty work with no lifting more than 50 pounds, no repetitive bending at the waist, and no squatting or kneeling, and he referred her to Dr. Michelle Turnley, a physiatrist who practiced with Dr. Cordover and him. On a separate form, Dr. Cusmariu indicated that Freeman was limited to medium-duty work rather than light-duty work.
On August 12, 2009, Dr. Cusmariu indicated in a form that he filled out for what appears to be Maxim’s workers’ compensation insurance carrier that his referral of Freeman to a physiatrist was related to the December 24, 2008, accident because Freeman had not experienced pain before the accident but had been experiencing pain since the accident. He indicated that the referral was not related to a preexisting degenerative condition and that she could not return to her preinjury employment position.
A medical note from Dr. Turnley dated September 2, 2009, indicated that Freeman was continuing to experience pain and that she had swelling in her left leg that, according to Freeman, had been present since the December 2008 accident. Dr. Turnley diagnosed Freeman with persistent low-back and leg pain, and she indicated that she thought Freeman was experiencing sciatica. Dr. Turnley administered a trigger-point injection to Freeman and prescribed medication to her. She limited Freeman to medium-duty work with no repetitive bending at the waist and no squatting or kneeling.
In a medical note dated October 14, 2009, Dr. Turnley indicated that Freeman had right-sided sciatica and that she did not think that lumbar surgery was needed. In her deposition, which was admitted at trial, Dr. Turnley indicated that some of Freeman’s sciatica was preexisting but that she was “sure” that some of the sciatica was related to Freeman’s December 24, 2008, accident. Dr. Turnley noted that Freeman was “extremely tender” near the lower lumbar region of her back, near her sacroiliac joint, and near her sciatic notch. She diagnosed Freeman with sciatic neuralgia and administered more trigger-point injections. Freeman received additional trigger-point injections during her appointment with Dr. Turnley on November 4, 2009.
On December 14, 2009, Freeman underwent a functional-capacity evaluation (“FCE”) as ordered by Dr. Turnley. Several tests were administered to her to determine whether she was performing with submaximal effort; those tests indicated that she was not. Several tests were administered to Freeman in an attempt to determine how much she could lift and carry. All of those tests except one were terminated due to pain Freeman experienced. Those tests indicated that Freeman could: carry 40 pounds, lift 20 pounds from the floor to her waist, occasionally lift 60 pounds from her waist to shoulder height, frequently lift 40 pounds from her waist to shoulder height, occasionally lift 40 pounds from the floor to shoulder height, and frequently lift 10 pounds from the floor to shoulder height. After the physical portion of the FCE, Freeman was administered a questionnaire. She became offended by the questions contained in the questionnaire and did not complete it.
On December 28, 2009, Dr. Turnley, after reviewing the results of the FCE, assigned Freeman a Wo permanent-partial-impairment rating and released her to return to work without restrictions. She *978 stated in her deposition that she did not believe that Freeman had any residual disability or impairment as a result of her work-related accident.
The deposition of Dr. Bruce Pava, Freeman’s personal physician, was entered into evidence. Dr. Pava testified that he began seeing Freeman in April 2004 for treatment related to injuries she had received in an automobile accident. He noted that she presented in 2004 with a history of mild chronic back pain, but he also noted that she was not complaining of back pain at that time. Dr. Pava stated that he saw her on several occasions thereafter and that, before her December 24, 2008, accident, she did not complain of pain in her back.
Dr. Pava testified that he saw Freeman on January 26, 2009, and that she complained of back pain since the accident. Dr. Pava’s testimony indicated that he saw Freeman at least 10 more times before trial and that she consistently complained of pain in her lower back to him. At an appointment in September 2009, he noted that she had swelling in her left leg that had been present for the previous nine months. At an appointment in October 2009, he ordered an MRI of Freeman’s lower back; the MRI revealed mild spinal stenosis, generalized disk disease, and facet changing.
In May 2011, Dr. Pava admitted Freeman to the hospital for severe low-back pain and incontinence brought on by that pain. At the hospital, she was administered a nerve block that relieved her pain. She was discharged after six days.
On July 19, 2010, at the request of Freeman’s attorney, Dr. Pava completed a form in which he listed a number of restrictions to Freeman’s ability to work, including: occasional lifting of 20 pounds; frequent lifting of less than 10 pounds; standing or walking less than 2 hours in an 8-hour work day; periodically alternating sitting and standing; limited pushing and pulling with her arms and legs; only occasional climbing ramps and stairs, balancing, stooping, kneeling, and crouching; no crawling; and limited reaching with her arms. Dr. Pava opined that Freeman was unable to do the work of a licensed practical nurse because of the problem with her back. He indicated that he did not perform an FCE on Freeman and that he had not seen the results of the FCE that had been performed on her. Dr. Pava opined that Freeman’s back pain was related to her December 24, 2008, accident.
Two reports prepared by Russ Gurley, a licensed professional counselor, were submitted at trial. In the first report, Gurley indicated that he had performed a vocational evaluation of Freeman, and he opined, based on Dr. Turnley’s opinion that Freeman could return to work without restrictions, that Freeman had a 0% vocational-disability rating. Later, Gurley was provided with Dr. Pava’s opinions as to Freeman’s work restrictions. In his second report, Gurley indicated, based on Dr. Pava’s opinions, that Freeman would have a vocational-disability rating of 65% to 75%.
A vocational-disability report prepared on August 4, 2010, by Michael Staff, a rehabilitation counselor, was submitted into evidence. In that report, Staff indicated that he had reviewed Freeman’s medical records, as well as the various work restrictions that had been placed on Freeman. Staff opined that Freeman’s vocational disability was 69% based on her low-back injury.
Freeman testified that she last worked for Maxim in April 2009 and that, from the time of the accident until she left her employment with Maxim, she had been limited to light-duty work. She stated *979 that, since her employment with Maxim ended, she had worked at a rehabilitation facility for a short period; she stopped working there because she was unable to perform the full duties of that job. Freeman also stated that she had worked for the United States Census Bureau for a short period during the 2010 census. She testified that she had also worked as a home-health aide for a short period but that she could not perform that job after her patients became bedridden.
Freeman testified that since Dr. Turnley had released her from her care, Dr. Pava had continued to treat her for pain in her lower back, leg, and hip. She testified that, since the December 24, 2008, accident, her pain had become progressively worse. Freeman testified as follows regarding a normal day for her:
“I get up. Hopefully, I can get to the bathroom by myself; sometimes I need assistance. I can prepare a light breakfast. I can load the top part of the dishwasher; sometimes my husband has to do that. You know, he does most of the heavy stuff in the house like sweeping and mopping, putting clothes in and out of the dryer, changing the beds. I do dusting, light meals. He cleans the bathtub.”
Freeman testified that she sometimes drives but that someone usually has to go with her to the grocery store to load and unload the groceries. She stated that, given her physical condition, she was not able to perform any of the jobs she had performed in the past. She testified that, before her accident, she had been able to fully perform the duties of her job with Maxim.
On August 2, 2011, the trial court entered a detailed judgment in which it found that Freeman suffered injuries resulting from an accident arising out of and in the course of her employment, that the injuries she sustained as a result of that accident were to her left hip and her left leg, and that the accident caused the chronic pain in her lower back or aggravated a preexisting condition in her lower back. The court found that Freeman was entitled to temporary-total-disability benefits, and, because her injuries involved an unscheduled member of her body, it found that she was entitled to permanent-partial-disability benefits for a period of 300 weeks, less the 12 weeks of temporary-total-disability benefits she had received. The trial court found that Freeman suffered a vocational disability of 69%. The trial court made an award to Freeman in accordance with those findings. Maxim appeals.
Section 25-5-81(e), Ala.Code 1975, provides the standard by which this court reviews appeals in cases arising under the Act. That section provides:
“(e) Review. From an order or judgment, any aggrieved party may, within 42 days thereafter, appeal to the Court of Civil Appeals and review shall be as in cases reviewed as follows:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
Discussing this standard, this court wrote in Reeves Rubber, Inc. v. Wallace, 912 So.2d 274 (Ala.Civ.App.2005):
“When this court reviews a trial court’s factual findings in a workers’ compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81 (e)(2), Ala.Code 1975. Substantial evidence is *980 ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Further, this court reviews the facts ‘in the light most favorable to the findings of the trial court.’ Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala.1996). This court has also concluded: ‘The [1992 Workers’ Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court.’ Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995). However, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App.2002) (citing § 25-5-81(e)(1), Ala.Code 1975).”
912 So.2d at 279.
Maxim contends that Freeman failed to prove that her December 2008 accident was the medical cause of the symptoms she experienced in her lower back. It points out that Dr. Turnley opined that there was not a causal relationship between Freeman’s December 2008 accident and her asserted back injury. It argues that Dr. Pava “admitted his lack of qualifications to disagree with [Freeman’s] authorized treating physician’s opinions, and deferred to her opinions and conclusions on that issue.” It also argues that Dr. Pava “deferred” to the FCE, which Maxim describes as having demonstrated that Freeman could perform all of her job functions as a licensed practical nurse with Maxim.
In Pair v. Jack’s Family Restaurants, Inc., 765 So.2d 678 (Ala.Civ.App.2000), this court described medical causation in the following manner:
“For an injury to be compensable, it must be ‘caused by an accident arising out of and in the course of the employee’s employment. § 25-5-51, Ala.Code 1975. The phrase ‘arising out of an employee’s employment requires a causal connection between the injury and the employment. Dunlop Tire & Rubber Co. v. Pettus, 623 So.2d 313 (Ala.Civ.App.1993). The phrase ‘in the course of the employee’s employment refers to the time, place, and circumstances under which the accident occurred. Id. In accidental cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused or was a contributing cause of the injury. Ex parte Trinity Indus., Inc., 680 So.2d at 266 n. 3. Medical causation may be found by the trial court without testimony from medical doctors. Ex parte Price, 555 So.2d 1060 (Ala.1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, A Division of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App.1993).”
765 So.2d at 681.
Reviewing the totality of the evidence in the present case, we conclude that there was substantial evidence indicating that Freeman’s accident caused or contributed to her back pain. Her testimony was that she felt a sharp pain in her back immediately upon overextending herself as she attempted to seat the patient she was holding in a wheelchair. She immediately sought treatment for the pain, and her medical records indicate that she consistently complained of moderate to severe *981 lower-back pain after the accident. Although the medical records indicate that Freeman had been diagnosed with chronic mild back pain before the accident, the evidence indicates that Freeman did not complain of lower-back pain at all during the four years that Dr. Pava treated her before the December 2008 accident and that she was fully able to perform her job at Maxim before the accident. The evidence thus reflects that the back pain Freeman experienced was substantially more severe and, for the first time, debilitating after the accident. The evidence of a substantial change in Freeman’s sympto-mology and ability to work provides some support for a finding of medical causation in this case. See Terry A. Moore, Alabama Workers’ Compensation § 7:24 (1998).
In addition, Dr. Pava testified that in his opinion, based on a reasonable degree of medical certainty, Freeman’s back pain was related to the December 2008 accident. Although Dr. Pava also testified that “to the extent that opinions [had] previously been offered by physicians who are licensed to practice medicine in either physical medicine, neurosurgery or orthopedic surgery,” he would defer to those opinions, he was never presented with a specific opinion contrary to his own regarding medical causation and asked whether he rescinded his own opinion regarding medical causation. At most, Dr. Pava’s testimony of general deference to doctors in particular specialties goes merely to the weight of his testimony, not to its admissibility. Additionally, although Dr. Pava testified that he did not have a basis to disagree with the results of any FCE that may have been performed on Freeman, Dr. Pava was not specifically asked about the results of the FCE that was performed on Freeman, and he later testified that he stood by the restrictions he had placed on Freeman regarding her ability to perform work tasks such as bending and lifting.
Maxim cites three cases in support of its contention that substantial evidence of medical causation is lacking in this case: Ex parte Southern Energy Homes, Inc., 873 So.2d 1116 (Ala.2003); Jackson Landscaping, Inc. v. Hooks, 844 So.2d 1267 (Ala.Civ.App.2002); and Valtex, Inc. v. Brown, 897 So.2d 332 (Ala.Civ.App.2004). As discussed below, those cases do not support Maxim’s contention.
In Ex parte Southern Energy Homes, Inc., 873 So.2d 1116 (Ala.2003), our supreme court concluded that a worker’s own testimony did not, standing alone, constitute substantial evidence indicating that her back injury was related to an accident at work. In reaching that conclusion, however, the supreme court relied on two aspects of the evidence before it that are not present in the present case. First, the supreme court noted that “[n]one of the doctors who treated [the worker] stated with any degree of certainty that [the worker’s back condition was due to the alleged workplace injury.” 873 So.2d at 1122. In the present case, as previously discussed, Dr. Pava testified to such a link. Second, the supreme court noted that the records of the worker’s doctor for the nine months he had treated her after the alleged accident did not mention the accident or that the worker had complained of back pain during that period. Id. In the present case, however, Freeman’s medical records indicate that she immediately complained of pain in her back after her December 2008 accident, and her medical records document that her complaints of back pain were consistent throughout the course of her treatment.
In Jackson Landscaping, Inc. v. Hooks, 844 So.2d 1267 (Ala.Civ.App.2002), the injured worker testified that he did not be *982 gin to experience pain in his back until 16 months after the accident that he alleged had caused his back injury. 844 So.2d at 1270. Furthermore, one of the doctors who treated the worker testified that the worker’s back injury was not related to his on-the-job accident, and the other doctor who treated the worker testified only that there was a “probability” that there “could have been” a causal relationship between the accident and the back injury. 844 So.2d at 1271. In the present case, Freeman complained of pain in her back immediately after the December 24, 2008, accident, and she consistently complained of back pain throughout her treatment. In addition, unlike the doctors who treated the worker in Jackson Landscaping, one of Freeman’s physicians in the present case, Dr. Pava, testified that, in his opinion, Freeman’s back pain was related to her accident.
In Valtex, Inc. v. Brown, 897 So.2d 832 (Ala.Civ.App.2004), this court reversed a judgment awarding benefits to a worker based on her complaints of head, shoulder, neck, and arm aches because of a lack of evidence of medical causation. In that case, because there was no evidence indicating that the worker experienced a sudden or traumatic event that could have served as the cause of her alleged injuries, the worker was required to produce clear and convincing evidence of medical causation. 897 So.2d at 334. Although the record contained the results of some diagnostic testing that revealed mild degenerative changes and a bone spur in the worker’s neck, the only evidence relating her pain to her employment was her testimony that she did not begin to experience pain until working for the employer. 897 So.2d at 337. The worker’s treating physician testified that he could not say with any degree of medical certainty what the cause of her symptoms were. 897 So.2d at 334. This court concluded that the worker’s testimony alone was not sufficient to prove medical causation. 897 So.2d at 337.
Unlike in Valtex, the present case involves a sudden or traumatic event, i.e., Freeman’s December 2008 accident. Not only does Freeman’s testimony regarding her condition before and after the December 2008 accident constitute substantial evidence of a causal connection between the accident and her back pain, see Moore, Alabama Workers’ Compensation § 7:24, supra, Dr. Pava’s deposition testimony likewise supports a finding of medical causation. Thus, the holding in Valtex is in-apposite to the present case.
In a single paragraph at the end of its brief, Maxim also contends that insufficient evidence supported the trial court’s finding of a 69% vocational disability by Freeman. We note that Maxim has failed to support that argument with citation to any legal authority, which violates Rule 28(a)(10), Ala. R. Civ. P. See City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998) (“When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research.”).
We also find Maxim’s argument to be unpersuasive. Dr. Pava, who, by the time of trial, had treated Freeman for over two years for her injuries arising out of the December 2008 accident, assigned limitations to her ability to engage in particular work activities. Those limitations formed, at least in part, the basis of the two opinions of the vocational counselors, one of whom opined that Freeman had a vocational loss of 69% and the other of whom opined that she had a vocational loss of 65% to 75%. Maxim points out that Dr. Pava testified that he had no basis to dispute the findings of any FCE that had *983 been performed on Freeman, but, as previously noted, he was not confronted with the findings of the FCE and he testified specifically that he stood by the restrictions he had assigned Freeman. Maxim has not argued, nor has it cited any legal authority for the proposition, that the trial court was required to reject Dr. Pava’s testimony regarding Freeman’s work limitations because of what it refers to as his “deference” to the FCE that was performed on Freeman.
Based on the foregoing, we conclude that Maxim has failed to demonstrate a basis on which to reverse the trial court’s judgment. As a result, the judgment is affirmed.
AFFIRMED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.